**Opinion issued July 21, 2015.**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-13-01068-CV

—————————————

**DIAMOND OFFSHORE SERVICES LIMITED AND DIAMOND OFFSHORE SERVICES COMPANY, Appellants**

**V.**

**WILLIE DAVID WILLIAMS, Appellee**

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2011-31922

**O P I N I O N**

In this Jones Act case, Willie David Williams sued Diamond Offshore Services Limited and Diamond Offshore Services Company (collectively, "Diamond Offshore") for negligence and unseaworthiness arising out of an

incident in which Williams allegedly injured his back while trying to repair a piece of machinery on board an offshore oil rig owned and operated by Diamond Offshore. The trial court rendered judgment on the verdict in favor of Williams, awarding Williams, once all applicable credits and offsets had been applied, approximately $8.5 million in compensatory damages, $235,381 in pre-judgment interest, and post-judgment interest. In three issues, Diamond Offshore contends that (1) the trial court erroneously excluded a post-incident surveillance video depicting Williams performing various outdoor activities; (2) the trial court erroneously excluded evidence that Diamond Offshore paid Williams 85% of his pre-incident salary for three years before trial; and (3) the jury's damages awards for past and future disfigurement, future medical expenses, loss of future earning capacity, future pain and mental anguish, and future physical impairment were excessive.

We affirm.

## Background

Diamond Offshore owned and operated the Ocean Lexington, a drilling rig located off the coast of Egypt in 2007–08. Williams, who had worked for Diamond Offshore on two different occasions and in various capacities for approximately a decade, was a mechanic on the rig. He worked on the rig in

2

alternating "hitches": twenty-eight days on the rig, followed by twenty-eight days off.

On the afternoon of January 7, 2008, the day before Williams was scheduled to return to the United States, one of the drillers informed him that a set of elevators on the rig had failed and that he needed to repair it.[1] Specifically, the driller told Williams that the rig was "going down" unless Williams repaired the elevators. Williams testified that, to him, this directive meant, "By any means necessary, fix it."

Williams worked on the elevators for about thirty to forty minutes. Williams bent over at the waist to maneuver the elevators, which weighed several hundred pounds, into his work area. Williams did not lift the elevators; instead, he "scoot[ed]" them around on the floor of the shop. While he worked on the elevators, Williams felt a "sharp pain in [his] lower back after a few minutes." After he finished working, Williams saw the doctor onboard the rig, who advised him to rest. The next morning, Williams bent over while sitting on his bed and felt discomfort in his back.

Because his back continued to hurt after he arrived home, Williams saw Dr. Patrick Barrett, an orthopedic surgeon, ten days after the incident. Although he is an independent physician and not a company doctor, Dr. Barrett has "seen patients

---

[1] An "elevator" is a piece of machinery that lowers pipes into the drilling hole on a rig.

off and on over the years for" Diamond Offshore, and Diamond Offshore referred Williams to Dr. Barrett after his injury in this case. Williams reported that he had leg pain in addition to back pain. Williams also told Dr. Barrett that he had injured his back on a rig in 2006, approximately two years before the incident at issue here. Williams acknowledged at trial that he had had ongoing back pain since the first incident, but that pain had "never stopped [him] from doing [his] job."[2]

Upon seeing Williams, Dr. Barrett ordered an MRI of Williams's lumbar spine. The MRI revealed a "small central herniation" at the L4-L5 vertebrae, "degenerative changes at multiple levels," and a "very small central bulge" at the L5-S1 vertebrae. Dr. Barrett saw Williams again in March 2008 after approximately six weeks of physical therapy. Williams had "rather significant pain in the mid to lower lumbar area," and another MRI revealed a herniation at L1-L2, a central disc protrusion at L4-L5, and another disc protrusion at L5-S1. In April 2008, Dr. Barrett performed a micro discectomy at L5-S1 to relieve Williams's lingering leg pain. Dr. Barrett testified that this surgery alleviated Williams's leg pain, but Williams's back pain remained unchanged and "continue[d] to be a major problem." Dr. Barrett's notes reflected that Williams was "simply unable to bend

---

[2] The trial court also admitted MRI records dated December 5, 2005, before either of Williams's two onboard back injuries had occurred, which revealed "[d]egenerative dis[c] disease of the lumbar spine."

4

or stoop or lift more than about 20 pounds without his back bothering him quite a bit."

In an attempt to relieve Williams's back pain, Dr. Barrett performed a fusion surgery in February 2009. This surgery involved inserting screws and rods into Williams's back. Dr. Barrett, who testified via video deposition taken in April 2012, nearly a year and a half before trial, stated that he had seen Williams one month prior to his deposition and that Williams still had problems with the nerve located next to the L5 vertebrae, which caused Williams's foot to drop and resulted in Williams's inability to raise his toes. Dr. Barrett testified that, in his opinion, further surgery would probably not help relieve Williams's lingering back pain. Dr. Barrett acknowledged Williams's pre-existing degenerative changes in his back but testified that the incident at issue caused all of Williams's current medical problems. Dr. Barrett stated that he would not release Williams to return to his former career on an offshore rig, and he opined that Williams "would have a hard time maintaining any kind of gainful employment due to his chronic pain, his chronic neurological findings; and I would professionally consider him totally disabled at this point." He further opined that, as a result of his chronic pain, Williams would likely "have a hard time even sustaining sedentary type work where he had to sit."

5

Dr. Jose Rodriguez, another orthopedic surgeon, testified that he reviewed Williams's medical records but did not treat Williams. Dr. Rodriguez stated that, in his opinion, "[t]he repetitive work that [Williams] was doing with some type of lifting associated with it caused his ruptured disc." Dr. Rodriguez testified that, after the fusion surgery, even if Williams was pain free, he would still restrict Williams to lifting not more than thirty pounds regularly and fifty pounds infrequently to avoid damaging the fusion. Dr. Rodriguez would also place restrictions on standing, sitting, and walking for long periods of time, as all of these actions place stress on the lumbar spine. Dr. Rodriguez agreed with Dr. Barrett that Williams could not return to his pre-incident offshore work. He stated that Williams could "do light-duty work if the tolerance to his [pain] allows him to function through a whole day of work."

Dr. Rodriguez testified that Williams could potentially undergo another surgery in the future to remove the screws and rods currently implanted in his back, which would hopefully improve his pain by at least fifty percent. He estimated that this procedure could cost up to $100,000. Dr. Rodriguez also testified that, even if Williams undergoes this "hardware removal" surgery, he would still have the same functional restrictions as before. He stated that Williams will need pain medications and some kind of physical exercise regimen daily for

the remainder of his life, which could range in cost from $5,000 to $10,000 per year.

Dr. Kenneth McCoin testified as Williams's economics expert. He testified that he calculated Williams's past lost earning capacity, measured from the date of the incident to the trial date, at $557,793 and his future lost earning capacity at $2,254,275. Dr. McCoin based his calculations on Williams's pre-incident annual salary of $134,000, the growth rate in wages, the fringe benefits, such as health insurance, the fact that Williams had received as a result of being employed, and Williams's work-life expectancy. Dr. McCoin stated on cross-examination that the "implicit assumption" in his calculations was that Williams would never return to any kind of work. He acknowledged that if Williams did return to work, his calculations would need to be reduced by the amount of Williams's new salary.

Williams no longer had tingling and numbness in his right leg after the first surgery in April 2008, but he testified that his back pain had never gone away. He stated that he had also developed a "foot drop problem," where one of his feet drags and he can no longer walk straight even on carpeted floors. Williams testified that, since the incident, he had tried to "live [his] life and do things," but that he had not "held a job where [he] receive[s] a check from anyone."

In July 2011, Williams underwent a "Functional Capacity Evaluation" that concluded that Williams could perform "medium level work." Diamond

7

Offshore's counsel asked Williams about this evaluation and about Dr. Rodriguez's testimony that Williams could "lift 30 pounds on a frequent basis and 50 pounds on an occasional basis" and whether Williams had attempted to find a job within those particular restrictions. Williams responded that he had not and further testified:

> [I've] been going through back surgery, two back surgeries. I get injections all the time. My back hurts constantly. I just saw the doctor three weeks ago. He wants to do exploratory surgery on my back. It's not just my back. Over the last year the—they have the documentation to show you this—the nerves between my back and my foot are not communicating anymore; and I can't move my toes, just my big toe. My toes are curling up under me. It's letting my foot drop down, and it's progressively getting worse and worse. So, I've just been talking to the doctors. They—I'm really not wanting to have any more surgery. They can't really promise me it's going to do me any good, but that's where we're at at this time.

Williams also testified that he can bend over, sit for a long period of time, stand for a long period of time, and work on cars, but that it hurts him to do all of these things.

Williams further stated that he tries to work on his property with an excavator that he owns. He testified that, for the most part, working with the excavator is stable and that he uses it for about thirty minutes at a time. He stated:

> I never said I couldn't work at all. That was the doctors or those other people. I've never stated I couldn't work at all. Anytime I said anything about that, I just said it hurts. I still do these things, all of these things. It just hurts me.

8

Williams testified that this type of work is not strenuous and that there is minimal vibration with the excavator, although his back will start to hurt if he sits in the excavator's seat for long periods of time.

Diamond Offshore's counsel asked Williams what kind of work he thought he could do after the incident. Williams responded:

> I don't know. If you're talking about me getting a job, I don't know how I would get a job. I take pain medication and muscle relaxers, and nobody's going to give you a job with that. I have bolts and rods in my back, and it hurts me. I don't know why anybody would hire me.

Williams testified that he "feel[s] terrible" and that he cannot enjoy life the way he used to because he cannot do things like ride motorcycles and race cars and boats and jet skis the way he did before the incident.

Several of Williams's friends and family members testified concerning the impact that the incident had had on Williams. Williams presented testimony from multiple witnesses that he had formerly been very active outdoors and with his fourteen-year-old daughter, who often wants to do things that Williams can no longer do, such as waterskiing and attending softball games. These witnesses testified that there is "a lot of stress" on Williams's family after the incident. The witnesses agreed that Williams tries to engage in the same activities that he used to enjoy, but that he cannot participate for very long, and that he often looks "defeated."

Williams's wife testified that since the incident Williams had been angry and depressed "a lot" and "[r]eal agitated," that they argue, and that Williams "feels like he's not worth what he used to be worth" because he can no longer provide for the family or do the things he used to enjoy doing. She also testified that Williams "still is miserable" and that Williams's injuries have affected his sleep schedule. Now, Williams hardly ever sleeps at night and instead sleeps "all day."

Thomas Meunier, a vocational rehabilitation counselor, testified that he met with Williams, performed several tests and evaluations of Williams, and reviewed Williams's medical records, including the July 2011 functional capacity evaluation, in arriving at a conclusion concerning whether Williams would be able to return to work. Meunier testified that Williams's past work history involved semi-skilled to skilled mechanic work, but that Williams did not have any transferrable skills given the postural and other work restrictions now in place on him after the incident. Meunier stated:

> I don't think [Williams] has a residual capacity to maintain employment even at a lower-exertional level because of chronic pain of the medicals that I read from his treating physician. He, I believe, is motivated. I think he would be working if he could, but I don't think he's going to be able to successfully compete for employment. And I think the bigger problem he would have, even if he were able to secure some type of employment, would be able to maintain the employment, show up every day. So, I—I think that he has lost access to the competitive labor market, and he has a corresponding loss of earning capacity.

Meunier disagreed with the conclusion reached in the functional capacity evaluation that Williams could do "medium level" work, pointing out that Williams's ability to "stand and walk, bend, [and] stoop, are limited to an occasional basis." Meunier also did not agree that Williams could return to performing any skilled work, such as heavy equipment operation or mechanics, on a stable and consistent basis. Furthermore, Meunier discounted the functional capacity evaluation on the basis that it was two years old at the time of trial and medical testimony indicated that Williams's condition had worsened since that evaluation had been performed.

Bruce Brawner testified as Diamond Offshore's vocational rehabilitation counselor. Brawner relied upon the functional capacity evaluation and opined that Williams could likely seek employment as a dispatcher, a job involving light mechanic work, or perhaps car sales or customer service. He researched the median pay in Mississippi, where Williams lives, for these professions and concluded that, if Williams found one of these jobs, Williams could potentially make around $38,600 per year. Brawner testified that each of these jobs is consistent with the physical restrictions that Dr. Rodriguez testified needed to be applied to any of Williams's future jobs.

Dr. Kenneth Boudreaux, an economist, testified for Diamond Offshore concerning potential economic loss sustained by Williams. Dr. Boudreaux testified

11

that he calculated Williams's past lost earning capacity as $504,045. With respect to loss of future earning capacity, Dr. Boudreaux stated that Diamond Offshore's counsel asked him to assume that Williams could earn roughly $38,600 per year in the future. He calculated Williams's lost future earning capacity at $760,435.[3] Dr. Boudreaux clarified that the figure for past plus future lost earning capacity equaled $1.264 million.

Dr. Christopher Cenac, an orthopedic surgeon in Louisiana, testified as Diamond Offshore's medical expert. Dr. Cenac reviewed Williams's medical records and evaluated him in person in February 2012. Dr. Cenac agreed that further relief from Williams's symptoms was not likely, even if he did undergo a hardware-removal surgery in the future, and that Williams had reached maximum medical improvement. Dr. Cenac noted that Williams has "post-surgical scarring . . . in the midline [of Williams's back] near the incision." Dr. Cenac also testified, however, that based on the July 2011 functional capacity evaluation and Williams's responses on the Oswestry pain questionnaire, which were consistent with "patients that are either bed bound or exaggerating their symptoms," Williams was employable in the future. He ultimately concluded that "hardware removal" would be appropriate and that Williams "was employable with a medium level of

---

[3]    Dr. Boudreaux stated that the $760,000 figure represents the midpoint of a "reasonable" range of lost future earning capacity figures, with $668,000 at the lower end and $853,000 at the upper end.

12

physical activity based upon the findings noted on the [functional capacity evaluation], subsequent to extensive vocational rehabilitative efforts."

At a pre-trial hearing and in written objections, Williams objected to the admissibility of two pieces of evidence offered by Diamond Offshore. Williams first objected to evidence that Diamond Offshore had, "during the first couple of years of [Williams's] disability," paid Williams approximately eighty-five percent of his former salary, totaling over $260,000. Williams argued that these payments were part of a Diamond Offshore procedure "whereby the employee is paid a portion of his salary as an 'advance' against any future settlement agreement . . . and then given the remaining 15% to 'make him whole' when he recovers from his disability and returns to work." Williams argued that evidence of these payments was inadmissible pursuant to Texas Rule of Evidence 408. Williams stated that he would be willing to stipulate that Diamond Offshore was entitled to a "post-verdict credit or offset of these payments."

Diamond Offshore argued that the payments did not constitute a settlement, that it did not make the payments in attempt to persuade Williams to release any claims against it, and that these payments were part of its standard procedure whenever an employee suffered an injury. Diamond Offshore's counsel stated that the company would "advance wages on [the employee's] salary to the point that they receive 85 percent of whatever they were making before they got hurt."

Diamond Offshore argued that these payments were not classified as a settlement, but rather as earnings upon which Williams paid taxes.

The trial court ruled that the evidence was inadmissible. The court agreed to give Diamond Offshore a corresponding offset in the judgment, if the jury found in favor of Williams, but it refused to let Diamond Offshore present evidence that it had made these payments to Williams.

Williams also sought to exclude a post-incident surveillance video of him taken in 2012, nearly five years after his injury occurred, by an investigator hired by Diamond Offshore.  Williams stated:

> Along with showing him driving and walking in several locations, these surveillance videos contain views of the plaintiff engaged in various activities near and around his residence, including performing various repairs on his four-wheeler vehicle, operating his mini-excavator to clear some debris near his home, and certain activities involving some bending and lifting, activities which he has never denied, under oath or otherwise, that he has attempted and was able to perform (nor are inconsistent with his medical limitations).

He argued that the video has no impeachment value because he has never asserted that he cannot do any of the activities depicted in the video. Williams further argued that the prejudicial effect of the video far outweighed any probative value that it might have and that the video could not serve as substantive evidence "since such a minimal and random view of plaintiff's life cannot possibly be a fair representation of his disabilities or abilities since his injury."

14

Diamond Offshore argued that the video consisted of surveillance footage taken on three consecutive days in December 2012 and depicted Williams "with evident ease to be seen bending, stooping, reaching, and throwing as he manually picks up debris on his property and puts it in the back of a trailer. He gets back in his trailer, hauls it off. He's apparently disposing of stuff." In the video, Williams operates machinery "for an extended period of time" and repairs vehicles. Diamond Offshore argued that the video was admissible for both impeachment purposes and as substantive evidence relating to Williams's post-incident physical condition.

The trial court ruled that Diamond Offshore "can keep [the video] in your reserve bank for impeachment, and that's it. So, if [Williams] opens the door, then we'll take a look at it." Diamond Offshore requested that the trial court revisit this ruling on several occasions throughout the proceedings, including during Dr. Rodriguez's testimony and after cross-examination of Williams, both of which, Diamond Offshore's counsel argued, contradicted the contents of the video. The trial court refused to admit the surveillance video.

The jury found that both Diamond Offshore and Williams were negligent and that Diamond Offshore failed to furnish a seaworthy vessel. The jury apportioned 30% fault to Diamond Offshore, 60% fault to the vessel Ocean Lexington, and 10% fault to Williams. The jury awarded Williams $500,000 in

15

past physical pain and mental anguish, $3.4 million in future physical pain and mental anguish, $557,793 in loss of past earning capacity, $2,254,275 in loss of future earning capacity, $250,000 in past physical impairment, $1.7 million in future physical impairment, $250,000 in past disfigurement, $325,000 in future disfigurement, and $440,000 in future medical care expenses.

The trial court entered judgment on the verdict in favor of Williams. The final judgment stated:

> Plaintiff Willie David Williams recover from Defendants Diamond Offshore Services Limited and Diamond Offshore Services Company, jointly and severally, the total sum of $8,512,068 as actual damages (which represents the total recovery less the ten percent (10%) of fault attributed to Willie David Williams by the jury, then less an offset of $197,293 reduction for the net advances paid by Defendants) . . . .

The trial court also awarded Williams pre- and post-judgment interest. This appeal followed.

**Exclusion of Evidence**

In its first issue, Diamond Offshore contends that the trial court erroneously excluded a post-incident surveillance video taken by an investigator hired by Diamond Offshore that depicted Williams performing various outdoor activities over the course of three days in December 2012. In its second issue, Diamond Offshore contends that the trial court erroneously excluded evidence that, for several years before trial, it paid Williams 85% of his pre-incident salary.

## A.    Standard of Review

The admission or exclusion of evidence "is committed to the trial court's sound discretion." *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995). A trial court does not abuse its discretion simply because the appellate court would have ruled differently under the same circumstances. *See E.I. DuPont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). We uphold a trial court's evidentiary ruling "if there is any ground for doing so, even if the trial court did not rely upon the proper ground and even if the defendant did not assert a proper ground for excluding the evidence." *K.J. v. USA Water Polo, Inc.*, 383 S.W.3d 593, 610 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 ("[E]ven where the trial court errs in sustaining a specific untenable objection, an appellate court should uphold the ruling if there is any other ground for doing so, even though not urged below.").

For the exclusion of evidence to constitute reversible error, the complaining party must demonstrate (1) that the trial court committed error, and (2) that the error was reasonably calculated to, and probably did, cause rendition of an improper judgment. *Hahn v. Love*, 394 S.W.3d 14, 34 (Tex. App.—Houston [1st

Dist] 2012, pet. denied). "[A] successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted." *Able*, 35 S.W.3d at 617. We generally do not reverse a judgment based on an erroneous ruling on evidence admissibility when the evidence in question is cumulative and is not controlling on a material issue dispositive to the case. *Id.* In determining if the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record. *Id.*; *Hahn*, 394 S.W.3d at 35.

## B.    *Exclusion of Surveillance Video*

Diamond Offshore first challenges the trial court's decision to exclude its proffered post-incident surveillance video, an eighty-minute video that depicted Williams performing various outdoor tasks, such as using his excavator to haul debris and working on a vehicle, over the course of three days in December 2012. It argues that the trial court erroneously determined that the surveillance video could be used solely for impeachment purposes and that, instead, the video was admissible as both substantive evidence relevant to the extent of Williams's injuries and as impeachment evidence. Williams, however, contends that the prejudicial effect of the "heavily edited" video substantially outweighs any probative value, and it is, therefore, inadmissible under Rule 403. He also argues that Diamond Offshore did not establish the authenticity of the video, as required

18

by Texas Rule of Evidence 901(a).  *See* TEX. R. EVID. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the  matter in question is what its proponent claims.").  Finally, he argues that this evidence was cumulative.  *See* TEX. R. EVID. 403.

Texas courts have admitted post-accident surveillance videos depicting the activities of injured plaintiffs in personal injury cases, but no Texas case addresses, as a specific point on appeal, the admissibility and propriety of this evidence.  *See Huston v. United Parcel Serv., Inc.*, 434 S.W.3d 630, 642 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (considering post-accident surveillance video in factual sufficiency review of damages award; appellant plaintiff did not challenge admissibility of video on appeal); *Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 424 (Tex. App.—Eastland 2006, no pet.) (upholding exclusion of six-second portion of surveillance video in which plaintiff made obscene gesture; appellant did not challenge trial court's admission of remainder of video); *Dunn v. Bank-Tec S.*, 134 S.W.3d 315, 329 & n.7 (Tex. App.—Amarillo 2003, no pet.) (addressing whether surveillance video had been properly authenticated and stating that appellants waived any argument that prejudicial effect of video substantially outweighed video's probative value); *Home Ins. Co. v. Garcia*, 74 S.W.3d 52, 56–57 (Tex. App.—El Paso 2002, no pet.) (considering surveillance video in factual

sufficiency review; plaintiff did not challenge admissibility of video). Both Diamond Offshore and Williams thus rely on case law from other jurisdictions to support their contentions.

In *Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513 (5th Cir. 1993), the Fifth Circuit considered whether a post-accident surveillance video constituted substantive evidence in addition to merely impeachment evidence in a personal-injury case. The Fifth Circuit defined "substantive evidence" as evidence that "is offered to establish the truth of a matter to be determined by the trier of fact." *Id.* at 517. The plaintiff, Chiasson, claimed that as a result of her injury she had suffered "great physical and mental pain and anguish," and she sought damages to "loss of enjoyment from the activities of her normal life." *Id.* The court therefore noted that "the severity of [Chiasson's] pain and the extent to which she has lost the enjoyment of normal activity are among the key issues a jury must decide in calculating her damages." *Id.* The court concluded that evidence that "would tend to prove or disprove such losses" should be considered "substantive" evidence. *Id.* The court also noted that Chiasson had testified at trial that she is able to engage in her usual daily activities, but that she cannot do so "for too long of a period of time" before she starts to feel pain. *Id.* The court doubted whether the surveillance video at issue "discredits her testimony at all," but still ultimately held that, not

20

only did the video constitute substantive evidence, instead of merely impeachment evidence, but that the importance of the video was "obvious."[4]

The Fifth Circuit affirmed its reasoning in *Chiasson* in *Baker v. Canadian National/Illinois Central Railroad*, 536 F.3d 357, 369 (5th Cir. 2008). After the his accident, Baker alleged that his injuries and post-accident limitations included "the inability to count money, make change, or be in crowds." *Id.* Illinois Central offered a surveillance video that depicted Baker "spending long periods of time in casinos," and Baker argued, among other things, that the video "informed jurors that he engaged in activities many people consider immoral." *Id.* The Fifth Circuit held, pursuant to *Chiasson*, that this video constituted substantive evidence. *Id.* The court also noted that the issue of Baker's "post-accident quality of life was hotly disputed" and that Baker's witnesses "testified in details regarding the allegedly severe post-accident limitations Baker face[d]." *Id.* The court ultimately concluded that the probative value of the video that contradicted Baker's witnesses "weighs heavily against a hypothetical juror's moral aversion to gambling." *Id.*

---

[4] The precise issue in *Chiasson* was whether the trial court erred in admitting the surveillance video solely as impeachment evidence when, pursuant to Federal Rule of Civil Procedure 26(b)(1), which allows the "non-disclosure of evidence to be used solely for impeachment," Zapata had not disclosed the existence of the video to Chiasson pre-trial. 988 F.2d 513, 514 (5th Cir. 1993). Because the surveillance video at issue constituted substantive evidence, instead of simply impeachment evidence, the Fifth Circuit held that the trial abused its discretion "by allowing non-disclosure and admitting the tape into evidence." *Id.* at 518.

21

The court held that the trial court did not abuse its discretion by admitting the surveillance video. *Id.*

In *James v. Carawan*, 995 So.2d 69 (Miss. 2008), the Mississippi Supreme Court addressed whether the trial court abused its discretion in excluding a post-accident surveillance video of the plaintiff, who had injured her back, riding rollercoasters at a Six Flags amusement park. In concluding that the trial court did abuse its discretion in excluding the video, the court noted that "[a] reasonable juror could conclude that the Six Flags video casts doubt on the severity of Carawan's injuries," that "a reasonable juror might conclude that the Six Flags video has a tendency to show that Carawan may not have been as weakened or vulnerable as she indicated to her doctors or as her medical treatments suggest," that "[t]he video also could have been relevant to whether or not she truly had been unable to work," that the video was relevant to the question of appropriate damages for pain and suffering, and that "this video might shed doubt upon the merits of Carawan's case as a whole." *Id.* at 76. The court concluded,

> We already have determined that the video was relevant. Aside from its damaging effect to Carawan's case, we are unable to determine how its admission would unfairly prejudice Carawan. A reasonable juror could understand that the video calls into question the severity of Carawan's injuries prior to July 29, 2003, and therefore challenged the necessity of at least some of her medical expenses, the validity of her lost wages, the extent of her pain and suffering, and the legitimacy of her entire claim.

22

*Id.* at 77–78; *see also Zegarelli v. Hughes*, 814 N.E.2d 795, 798 (N.Y. 2004) (holding that trial court committed reversible error in excluding post-accident videotape of injured plaintiff shoveling snow after plaintiff testified that he took "two or three swipes" of parking area with shovel); *Sweet v. Pace Membership Warehouse, Inc.*, 795 A.2d 524, 528 (R.I. 2002) (reversing trial court's decision to exclude post-accident surveillance video and directing trial court, on remand, to evaluate admissibility of video under Rule 403).

Williams, in contrast, cites cases from other jurisdictions holding that the trial court did not abuse its discretion in excluding post-accident surveillance videos. In one line of cases from Illinois, the appellate court, in concluding that the danger of unfair prejudice outweighed the probative value of the surveillance videos, focused on the facts that the videotapes were edited and only showed the plaintiff outside, "giv[ing] the impression that [the] plaintiff's activity is constant" and that the plaintiff "can sustain labor-intensive activities over a period of time without rest or without experiencing pain." *See Carroll v. Preston Trucking Co.*, 812 N.E.2d 431, 435–36 (Ill. Ct. App. 2004); *see also Donnellan v. First Student, Inc.*, 891 N.E.2d 463, 478 (Ill. Ct. App. 2008) (relying on *Carroll* to affirm exclusion of surveillance video and stating, "Despite defendant's contention that [the videographer] testified that the video was not edited to demonstrate only the period plaintiff was working and that he filmed every moment that he could, the

video leaves the impression that plaintiff was working for extended periods of time"). Williams also cites *Quinn v. Wal-Mart Stores, Inc.*, 774 So. 2d 1093, 1098 (La. Ct. App. 2000), for the proposition that the trial court properly excludes a post-accident surveillance video when the injured plaintiff testifies that she can perform the activities depicted in the video and when the video does "not fairly indicate whether [the plaintiff] did experience pain after engaging in these activities." *See also Orgeron v. Tri State Road Boring, Inc.*, 434 So. 2d 65, 68–69 (La. 1983) (noting, in holding that workers' compensation carrier had "no reasonable basis for terminating benefits" even though videotape existed of claimant performing physical labor at construction sites after injury, that "evidence in the form of moving pictures or videotapes must be approached with great caution because they show only intervals of the activities of the subject, they do not show rest periods, and do not reflect whether the subject is suffering pain during or after the activity").

Here, Diamond Offshore offered a surveillance video that depicts Williams performing various activities outside his house, including using his excavator to haul away scrap materials and repairing a vehicle. The hour-long video contains footage obtained over three consecutive days in December 2012. The video only reflects Williams's outside activities and does not reflect what he did when he was not outside or whether he was in pain as a result of his activities. During his

24

testimony, Williams acknowledged that he could perform the activities depicted in the surveillance video, although he emphasized that he could only engage in these activities for short periods of time before he felt pain and that he would be in pain later after engaging in these activities. Williams's friends and family members testified to essentially the same facts.

A trial court's evidentiary rulings are committed to the court's "sound discretion," and we must uphold the court's ruling if there is any basis for doing so. *See Able*, 35 S.W.3d at 617; *USA Water Polo*, 383 S.W.3d at 610. Here, the trial court did not state a reason for its ruling; instead, it merely stated at the pre-trial hearing that Diamond Offshore could "keep [the surveillance video] in your reserve bank for impeachment" and that, if Williams "opens the door, then we'll take a look at it." When Diamond Offshore offered the video after Dr. Rodriguez's testimony, the court stated, "Ruling stands the same," and when Diamond Offshore offered the video after cross-examination of Williams, the court stated, "No, not admitting," without providing a rationale. No Texas case squarely addresses the issue present here—the admissibility of post-accident surveillance videotapes as either substantive or impeachment evidence—and cases from other jurisdictions have emphasized the trial court's discretion in ruling on the admissibility of such evidence, upholding trial courts' rulings admitting post-accident surveillance videos and upholding rulings excluding this evidence. In the absence of authority

25

binding on this Court, we cannot conclude that the trial court abused its discretion in excluding the post-accident surveillance video offered by Diamond Offshore. The trial court could have reasonably determined that the proffered video, which contained clips from three different days of surveillance edited together into one continuous hour-long video and depicted Williams performing activities that he admitted that he could do, albeit with pain later, created an impression that Williams could engage in physical activity for long periods of time without needing rest and without apparent pain and thus that the prejudicial effect of the video outweighed the video's probative value. *See Donnellan*, 891 N.E.2d at 478; *Carroll*, 812 N.E.2d at 435–36; *Quinn*, 774 So. 2d at 1098; *see also USA Water Polo*, 383 S.W.3d at 610 (stating that we uphold trial court's evidentiary rulings "if there is any ground for doing so, even if the trial court did not rely upon the proper ground and even if the defendant did not assert a proper ground for excluding the evidence"). We therefore hold that the trial court did not abuse its discretion in excluding the surveillance video proffered by Diamond Offshore.

We overrule Diamond Offshore's first issue.

## C.    *Exclusion of Salary Payments*

Diamond Offshore also challenges the trial court's exclusion of evidence that, for several years pre-trial, Diamond Offshore paid Williams 85% of his pre-incident salary, totaling over $260,000. Diamond Offshore argues on appeal that

excluding this evidence left the erroneous impression with the jury that Williams had no income to provide for his family during the years between the incident and the trial, that Diamond Offshore "left [Williams] high and dry during his recovery," and that Diamond Offshore did not care about its employees, which caused the jury to use the compensatory damages awards to punish Diamond Offshore. The trial court excluded the evidence but noted on the record that, if the jury returned a verdict in Williams's favor, the court would offset the damages award by the amount that Diamond Offshore had previously paid to Williams. The trial court ultimately discounted the award to Williams by $197,253 as a result of "net advances" paid to Williams by Diamond Offshore.

Assuming, without deciding, that the trial court erred when it excluded evidence that Diamond Offshore had paid Williams 85% of his pre-incident salary, Diamond Offshore has not demonstrated that this exclusion constitutes reversible error. *See Able*, 35 S.W.3d at 617 (holding that successful challenge to evidentiary ruling generally requires complaining party to show judgment turned on excluded evidence); *Hahn*, 394 S.W.3d at 34 (stating that, to be reversible, error must be reasonably calculated to, and probably did, cause rendition of improper judgment). As Diamond Offshore acknowledges, the trial court offset the ultimate damage award in the final judgment to account for the amounts paid to Williams.

27

Diamond Offshore's arguments of harm as it relates to the exclusion of these payments are, however, entirely speculative. There is no indication in the record that the jury inflated one of the damages awards in an attempt to punish Diamond Offshore for a misperception that Diamond Offshore abandoned Williams and left him in a precarious financial situation prior to trial. Instead, the record reflects that Williams underwent two surgeries as a result of the incident, that he suffers from "constant" back pain and likely will for the rest of his life, that he suffers from progressive "foot drop," that he can no longer engage in outdoor activities and activities with his daughter due to his chronic pain, and that he will likely be unable to work even in "light" or sedentary jobs in the future due to his pain, all of which, as we explain further below, justifies the jury's damages awards. We conclude that Diamond Offshore has not demonstrated that the trial court's exclusion of evidence that Diamond Offshore paid Williams 85% of his pre-incident salary "was reasonably calculated to, and probably did, cause rendition of an improper judgment." *Hahn*, 394 S.W.3d at 34. We hold that the trial court did not commit reversible error by excluding this evidence.

We overrule Diamond Offshore's second issue.

### Sufficiency of the Evidence of Damages

In its third issue, Diamond Offshore challenges the sufficiency of the evidence to support the jury's awards for past and future disfigurement, future

28

medical care expenses, loss of future earning capacity, future physical pain and mental anguish, and future physical impairment.[5]

Texas courts of appeals have the power to review the excessiveness of damage awards and to order remittitur in Jones Act cases. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). We must make our own "detailed appraisal of the evidence bearing on damages." *Id.*

The standard of review for an excessive-damages complaint in a Jones Act case is factual sufficiency of the evidence. *Id.* In reviewing a challenge to the factual sufficiency of the evidence, we "must consider and weigh all of the evidence and should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)); *see also Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (same). The fact-finder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005); *Arias*, 265 S.W.3d at 468; *see also Lanier v. E. Founds., Inc.*, 401 S.W.3d

---

[5]     We note that Diamond Offshore does not challenge on appeal the sufficiency of the evidence to support the jury's finding that Diamond Offshore was negligent and that its negligence "was a cause, in whole or in part," of Williams's injuries.

445, 455 (Tex. App.—Dallas 2013, no pet.) ("When we review the evidence, we may not reweigh it and set aside the verdict merely because we feel a different result is more reasonable."). Because it is the fact-finder's province to resolve conflicts in the evidence, we assume that it resolved all such conflicts in favor of the verdict if reasonable people could do so. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

The jury generally has great discretion in considering the evidence relevant to the issue of damages. *See Lanier*, 401 S.W.3d at 455 (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986)); *Tagle v. Galvan*, 155 S.W.3d 510, 518 (Tex. App.—San Antonio 2004, no pet.) ("In assessing personal injury damages, the jury has wide latitude in determining the amount of the award."). "The process of awarding damages for amorphous, discretionary injuries such as pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* The element of pain and suffering is "not subject to precise mathematical calculations or objective analysis and is particularly within the province of the jury to resolve and to determine appropriate amounts." *Id.* "Once the existence of some pain, mental anguish and disfigurement has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the fact finder." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—

Houston [1st Dist.] 2010, no pet.) (quoting *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)).

Issues such as physical impairment are necessarily speculative, "and it is particularly within the jury's province to resolve these matters and determine the amounts attributable thereto." *Lanier*, 401 S.W.3d at 455; *Figueroa*, 318 S.W.3d at 62 ("The amount of damages awarded for pain and suffering and disfigurement are necessarily speculative and each case must be judged on its own facts."). To recover damages for physical impairment, "the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity." *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003)). The jury may consider "loss of enjoyment of life" as a factor in assessing damages for physical impairment. *Id.*

Courts have defined disfigurement as "that which impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figueroa*, 318 S.W.3d at 64 (quoting *Pardue*, 186 S.W.3d at 18). The fact that the disfigurement, such as a scar, is located underneath clothing and may not generally be visible, does not render disfigurement non-compensable. *See Wal-Mart Stores, Inc. v. Tinsley*, 998 S.W.2d 664, 673 (Tex. App.—Texarkana 1999, pet. denied) (holding that "small" surgical scar located on plaintiff's lower

31

back and hip that was covered by clothing was compensable). Future disfigurement is "necessarily speculative," and "there is no mathematical yardstick by which one can measure damages for it." *Figueroa*, 318 S.W.3d at 64 (quoting *Tri-State Motor Transit Co. v. Nicar*, 765 S.W.2d 486, 494 (Tex. App.—Houston [14th Dist.] 1989, no writ)). Proof of additional scarring or deforming is not required to recover damages for future disfigurement, although it may be considered as a factor in determining damages. *Hopkins Cnty. Hosp. Dist. v. Allen*, 760 S.W.2d 341, 344 (Tex. App.—Texarkana 1988, no writ). Recovery for future disfigurement includes recovery for future embarrassment caused by the disfigurement. *Id.*

The Texas Supreme Court has defined "mental anguish" as a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). To survive a sufficiency challenge, the plaintiff must have introduced direct evidence of the nature, duration, and severity of his mental anguish, establishing a substantial disruption in his daily routine. *Id.*; *Finley v. P.G.*, 428 S.W.3d 229, 235 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("[A]n award of mental anguish damages may be supported by some evidence of 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'"). If compensable mental anguish has been established,

32

fixing the exact amount of damages is "generally left to the discretion of the fact finder," although the amount must be "fair and reasonable compensation." *Finley*, 428 S.W.3d at 235 (quoting *Figueroa*, 318 S.W.3d at 62). The injured party can establish mental anguish through his own testimony explaining how he felt and how the injury disrupted his life. *Tagle*, 155 S.W.3d at 519.

Loss of future earning capacity is the plaintiff's diminished capacity to earn a living after trial. *Plainview Motels, Inc. v. Reynolds*, 127 S.W.3d 21, 35 (Tex. App.—Tyler 2003, pet. denied). Proof of lost earning capacity is always uncertain and is left largely to the jury's discretion. *Rigdon Marine Corp. v. Roberts*, 270 S.W.3d 220, 232 (Tex. App.—Texarkana 2008, pet. denied). To support an award of damages for loss of future earning capacity, the plaintiff must introduce evidence sufficient to allow the jury to reasonably measure earning capacity in monetary terms. *Tagle*, 155 S.W.3d at 519. The plaintiff can introduce evidence of past earnings; his stamina, efficiency, and ability to work with pain; the weaknesses and degenerative changes that will naturally result from the plaintiff's injury; and the plaintiff's work-life expectancy. *Id.* The plaintiff must introduce some evidence that he had the capacity to work prior to the injury and that his capacity was impaired as a result of the injury. *Id.*

Similarly, courts have held that the award of future medical expenses rests within the jury's sound discretion. *Rosenboom Mach. & Tool, Inc. v. Machala*,

33

995 S.W.2d 817, 828 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). The jury can make its determination of the amount of future medical expenses based on the injuries suffered, the medical care rendered before trial, the progress toward recovery under the treatment received, and the condition of the injured party at the time of trial. *Id.* To sustain an award of future medical expenses, the plaintiff must present evidence establishing that, in all reasonable probability, future medical care will be required and the reasonable cost of that care. *Id.*; *see Nat'l Freight, Inc. v. Snyder*, 191 S.W.3d 416, 422 (Tex. App.—Eastland 2006, no pet.). The plaintiff is not required to establish such costs through expert testimony. *See Snyder*, 191 S.W.3d at 426. Because "'an award of future medical expenses . . . lies largely within the factfinder's discretion,' appellate courts are especially hesitant to disturb a fact-finder's conclusion in this regard." *Finley*, 428 S.W.3d at 234; *Antonov v. Walters*, 168 S.W.3d 901, 908 (Tex. App.—Fort Worth 2005, pet. denied) ("Because issues such as life expectancy, medical advances, and the future costs of products and services are, by their very nature, uncertain, appellate courts are particularly reluctant to disturb a jury's award of these damages.").

### A. Disfigurement

Diamond Offshore contends that legally insufficient evidence supports the jury's award of $575,000 for past and future disfigurement, or, in the alternative,

that the award is excessive. Diamond Offshore contends that no witness testified about any external scarring and thus no evidence supports the disfigurement award.

As Williams points out, however, Diamond Offshore's own medical expert, Dr. Cenac, testified that, as a result of his two back surgeries, Williams has some "post-surgical scarring" near the incision on his back. The fact that this scar is in a location of the body that is usually covered up by clothing does not preclude a disfigurement award. *See Tinsley*, 998 S.W.2d at 673 (holding that evidence of "small" surgical scar located on plaintiff's back and hip constituted compensable disfigurement award).

Furthermore, "disfigurement" is not limited to scarring, but instead constitutes anything that "impairs the appearance of a person, or that which renders unsightly, misshapen or imperfect, or deforms in some manner." *Figueroa*, 318 S.W.3d at 64 (quoting *Pardue*, 186 S.W.3d at 18). Multiple witnesses, including Williams himself, testified that he now suffers from "foot drop" due to nerve damage from the injury, which has impaired his ability to extend several of his toes and raise his right foot when he walks. As a result, his foot "drags" when he walks, and he walks with a noticeable limp. Dr. Barrett testified that Williams's "foot drop" problem is "progressive." We conclude that this testimony supports the jury's decision to award damages for past and future disfigurement. *See USX Corp. v. Salinas*, 818 S.W.2d 473, 489 (Tex. App.—San Antonio 1991, writ denied)

35

(holding that sufficient evidence supports disfigurement award when plaintiff presented evidence that he "cannot stand straight" and, due to injury, walks "with a flat-foot stiff gait").

Diamond Offshore also cites three cases for the proposition that the disfigurement award in this case was "too high by an order of magnitude," but, in each of the three cases Diamond Offshore cited, the appellate court simply affirmed the damages award. *See Allen*, 760 S.W.2d at 344 (affirming $50,000 future-disfigurement award); *Nw. Mall, Inc. v. Lubri-Ion Int'l, Inc.*, 681 S.W.2d 797, 804 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) (affirming $25,000 past-disfigurement award and $30,000 future-disfigurement award); *Pedernales Elec. Co-op., Inc. v. Schulz*, 583 S.W.2d 882, 886 (Tex. Civ. App.—Waco 1979, writ ref'd n.r.e.) (affirming $4,000 disfigurement award). The fact that the appellate courts in each of these cases did not find a smaller disfigurement awards to be excessive does not support the conclusion that the disfigurement awards in this case—$250,000 in past disfigurement and $325,000 in future disfigurement—are excessive. Awarding damages for future disfigurement is "necessarily speculative," and "there is no mathematical yardstick by which one can measure damages for it." *Figueroa*, 318 S.W.3d at 64. Due to the speculative nature of a disfigurement damages award, courts generally leave the adequacy of the amount of the award to the discretion of the jury. *See id.* at 62. We conclude

36

that the evidence supporting past and future disfigurement is not so weak as to render the disfigurement awards excessive or manifestly unjust.

### B. Future Medical Expenses

Diamond Offshore next contends that the jury's award of $440,000 for future medical expenses is excessive because evidence of future medical expenses that Williams "could or might incur is no evidence of recoverable expenses that he 'will require in the future.'"

Dr. Barrett, Williams's treating physician, testified that he does not have any future surgeries scheduled for Williams, and Williams testified that he is "really not wanting to have any more surgery" because none of his doctors can promise him that another surgery will help him. However, Dr. Rodriguez testified that Williams was a candidate for further surgery to remove the screws and rods in his back, and Dr. Cenac, Diamond Offshore's medical expert, testified that this hardware-removal surgery "would be appropriate." Dr. Rodriguez testified that medical bills for this surgery could range from $80,000 to $100,000. Williams testified that he saw his doctor three weeks before trial and that his doctor wanted to perform exploratory surgery on his back, although he had not committed to having any additional surgeries. Dr. Rodriguez also testified that Williams will need daily pain medication and physical therapy for the rest of his life, and he estimated that costs for this care would range from $5,000 to $10,000 per year.

37

The jury thus had evidence before it that, even though Williams's preference at the time of trial was not to have another surgery, a hardware-removal surgery was medically indicated and "would be appropriate." Williams was not required to establish his future medical expenses with absolute certainty; instead, he needed to present evidence "that in all reasonable probability, future medical care will be required and the reasonable cost of that care." *See Machala*, 995 S.W.2d at 828. The jury, in its sound discretion to award damages for future medical expenses, could have reasonably concluded that, given the degenerative nature of Williams's conditions, Williams, "in all reasonable probability" will require pain medication and physical therapy for the remainder of his life and may elect to undergo further surgery to alleviate his pain. *See id.* (holding that award of future medical expenses "rests within the sound discretion of the jury"). We hold that the jury's award of $440,000 in future medical expenses was not excessive.

### C. Lost Future Earning Capacity

Diamond Offshore next contends that the jury's award of $2,254,275 for lost future earning capacity is excessive because it rests on the assumption that Williams will never be able to work again, and factually insufficient evidence supports that assumption.

Dr. Kenneth McCoin, Williams's economic expert, testified that he arrived at his calculation of $2,254,475 for Williams's loss of future earning capacity

based on the assumption that Williams will not return to work in the future. Dr. Barrett testified unequivocally that Williams could not return to his pre-incident offshore work, a conclusion with which all of the other experts agreed. Dr. Barrett further testified that, as a result of his chronic pain, Williams likely would not be able to maintain any type of gainful employment, even sedentary-type work, and he also stated that he considered Williams to be "totally disabled." Dr. Rodriguez testified that Williams might be able to perform "light duty" work, but he also provided the caveat that this was true only if "the tolerance to [Williams's pain] allows him to function through a whole day of work." Thomas Meunier, a vocational rehabilitation counselor, testified that even if Williams could secure employment, he likely would not be able to maintain it given his chronic pain. In reaching his conclusion, Meunier considered the functional capacity evaluation that Williams had undergone, which indicated that Williams could perform "medium" level work, but he ultimately discounted it because it was two years old and evidence indicated that Williams's condition had worsened since that evaluation. Williams himself testified that he tries to do work around his property, including using his excavator and repairing vehicle, and he can engage in these activities to an extent, but it hurts him to do so, and he doubted his ability to perform a full day of work every day. He did not believe that any employer would

39

hire him given his pain levels and the pain medication and muscle relaxers that he must take.

To support its contention that factually insufficient evidence supported the assumption that Williams could not return to work, Diamond Offshore focuses on the functional capacity evaluation, Williams's testimony that he could still work but that it hurt him to do so, and Williams's testimony concerning activities that he undertakes even after the incident. As stated, however, Williams presented the testimony of three expert witnesses—two doctors and a vocational rehabilitation counselor—that Williams would probably not be able to sustain employment at even a light or sedentary level due to his chronic pain problems. We conclude that factually sufficient evidence supports the assumption that Williams will not be able to return to the workforce and thus supports Dr. McCoin's calculation of $2,254,475 in loss of future earning capacity damages. *See Rigdon Marine Corp.*, 270 S.W.3d at 232 (holding that loss of future earning capacity is "always uncertain" and is "left largely to the jury's discretion").

### D. Future Pain and Mental Anguish

Diamond Offshore also challenges the jury's award of $3.4 million in damages for future pain and mental anguish, focusing primarily on the fact that the jury was instructed that it could only award damages for the "portion of the plaintiff's condition resulted from the aggravation" of a pre-existing condition, and

the medical evidence indicated that Williams, at the time of the incident, already had a "diseased" back.

Diamond Offshore is correct that the record includes evidence that Williams had injured his back prior to the incident at issue in this case and that the MRI Williams underwent when he first saw Dr. Barrett after the incident in January 2008 revealed degenerative problems with the discs in his back. However, Dr. Barrett testified that the January 2008 incident on the Ocean Lexington caused all of Williams's current medical problems, including his foot drop and ongoing back pain, and necessitated both of the surgeries that Williams has needed since the incident. Specifically, Dr. Barrett testified:

> I think all of [Williams' current medical conditions] are caused by the injury that [Williams] described to me occurring 10 days or so before I first saw him. He certainly undeniably had preexisting degenerative changes but, also, in my opinion, undeniably there was a significant damage that led to the evaluations which led to the micro discectomy which led to basically a disruption of his back mechanics which led to our decision to try to improve those with the fusion. And all of this, in my opinion, relates back to this [in]jury.

Williams testified that he gets pain injections "all the time," that his back "hurts constantly," and that his foot drop is "progressively getting worse and worse." Both Dr. Barrett and Meunier characterized Williams's pain as "chronic." Several of Williams's friends and family members testified about seeing Williams in pain after the incident. Multiple witnesses, including Williams's wife, testified that he is "depressed" and "miserable" since the incident, that he has experienced a loss of

41

self-worth, and that Williams hardly ever sleeps through the night and instead sleeps "all day."

As it did in attacking the disfigurement award, Diamond Offshore compares the future pain and mental anguish award in this case to the award in other personal injury cases and argues that "[i]n light of other verdicts," the award in this case is "plainly excessive." Diamond Offshore contends that when an award of future pain and mental anguish exceeds $1 million, "the injury is usually catastrophic." Once again, however, in all of these cases, the appellate courts found the damage awards to be within the jury's wide discretion in awarding damages and affirmed the awards. Diamond Offshore cites no cases in which an appellate court found the future pain and mental anguish award to be excessive. Simply because an appellate court affirmed a $1 million future pain and mental anguish award as not excessive in a "catastrophic" injury case does not mean that the jury's award in this case is excessive or falls outside the jury's wide discretion in awarding damages. *See, e.g.*, *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165–67 (Tex. App.— Eastland 2009, pet. dism'd) (affirming, among other awards, award of $1 million for future pain and suffering and award of $300,000 for future mental anguish in case in which sixteen-year-old boy's hands were "degloved" following accident with steel roller machine).

Here, Williams presented evidence that he is in constant pain, that his condition, particularly his "foot drop," is getting worse, that he is likely to be in pain for the rest of his life, that he suffers from depression and a loss of self worth following the incident, and that he can no longer engage in the activities he used to enjoy to the extent and with the frequency that he used to engage in them before the incident. We conclude that the jury's award of $3.4 million for future pain and mental anguish is not excessive. *See Figueroa*, 318 S.W.3d at 62 (noting that damages for pain and suffering are "necessarily speculative" and that each case should be judged on own facts); *Tagle*, 155 S.W.3d at 518 (stating that pain and suffering is "not subject to precise mathematical calculations or objective analysis and is particularly within the province of the jury to resolve and to determine appropriate amounts").

### E. Future Physical Impairment

Finally, Diamond Offshore challenges the jury's $1.7 million award for future physical impairment as excessive.

One of the primary considerations in awarding damages for future physical impairment is the plaintiff's loss of enjoyment of life. *See Pardue*, 186 S.W.3d at 18. Here, Williams explicitly testified:

> I am, in fact, hurt real bad. I hurt on a daily [basis]. . . . I know I feel terrible. Just doing the little things I do hurts me. I can't enjoy life like I used to. I mean, I was always active. I've had motorcycles and race cars and boats and jet skis. I was [into] everything. You know, a

43

lot of that is—I still—still do those things—or some of those things but not—not at the extent I used to.

Williams testified that he tries to keep up with his favorite activities, such as working with his excavator, repairing vehicles, hunting, being outdoors with his daughter, and going to his daughter's softball games, but that it causes him pain to engage in these activities and that he can no longer do these activities like he used to do. Several of his friends and family members testified and related specific examples, and they also testified concerning the changes in Williams's personality as a result of being unable to participate in and enjoy life the way he used to do. Williams also presented medical testimony that his condition is likely to get progressively worse as he ages, further limiting his ability to be active.

Testimony at trial indicated that Williams, who was forty-four at the time of trial, was expected to live another thirty-four to thirty-five years. Diamond Offshore has again cited case law in which plaintiffs with "debilitating injuries" did not receive as high an award for future physical impairment as Williams did, but, again, these cases do not support the proposition that the jury's award in this case was excessive. We conclude that, in this case in which there is clear evidence that Williams cannot live his life the way that he used to, the jury's award of $1.7 in damages for future physical impairment is not excessive.

We overrule Diamond Offshore's third issue.

44

**Conclusion**

We affirm the judgment of the trial court.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justice Keyes, dissenting.