

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-22-00217-CV

———————————————————

PAUL HERCHMAN JR., DONNA HERCHMAN, AND PAUL HERCHMAN III,
Appellants

V.

BRITTNEY LEE, Appellee

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-293088-17

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Birdwell
Dissenting Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

This case centers on a Goldendoodle named Jake. After biting a child's face, Jake was adopted into the home of Appellants Donna and Paul Herchman Jr., where he bit their adult daughter's hand and arm. Later, Jake attacked Appellee Brittney Lee—the then-girlfriend of Paul and Donna's son, Appellant Paul "Trace" Herchman III—biting her face multiple times and leaving her with permanent scars and a downward-sloping smile. A jury found that the Herchmans (that is, Paul, Donna, and Trace) were strictly liable for Jake's attack on Brittney; that the Herchmans had been negligent; and that Jake's attack had caused Brittney approximately $2 million in disfigurement, pain, anguish, and impairment damages.

The Herchmans challenge nearly every aspect of this judgment. They dispute the evidentiary sufficiency of both of Brittney's claims; they contest the evidentiary sufficiency of the damage awards; they criticize various rulings on the admission of evidence at trial; they complain of the jury charge; and they argue that cumulative error warrants reversal in the interest of justice. None of these challenges pass muster. Because the Herchmans' evidentiary-sufficiency complaints turn on the jury's credibility determinations—which we cannot and will not override—and because their remaining challenges are unpreserved, we will affirm.

# I. Background[1]

At the time of Jake's attack, Trace and Brittney were dating, and Trace was temporarily staying with his parents—and with Jake. After a date one night, Trace and Brittney returned to the Herchmans' home and began talking on the patio while Jake paced nearby. Brittney laid down on a patio bench, and at one point, she reached to the ground to pick up her drink. As she did, Jake—who Brittney later remembered being approximately six feet away—"came up really quickly and grabbed [her] face," biting her "over and over again" until Trace pulled him away. Brittney's bite wounds required 149 stitches, ultimately leaving her with multiple noticeable scars covering one side of her face, a walnut-sized "wad" of scar tissue intruding into her mouth, and a smile that slanted downward on one side.

Jake was quickly euthanized. Indeed, although Paul and Donna had been out of town at the time of Jake's attack, when Trace told them what had happened, they directed him to have Jake euthanized immediately—even before they returned home. As it turned out, their decision was informed by the fact that Jake had bitten two other people prior to attacking Brittney.

In fact, the catalyst for Jake's adoption by the Herchmans had been a biting incident. Jake's prior owner—Tammy—had run a home daycare facility, and Jake had bitten the face of a three- or four-year-old child at the daycare after the child climbed

---

[1]The facts are recited in light of the jury's implied credibility determinations, including its implied resolution of factual disputes in favor of the verdict. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

on Jake's back. The episode had prompted Tammy to put Jake up for adoption. Soon after Jake was adopted into the Herchmans' home, he jumped up and their adult daughter LeAnn pushed him down, prompting Jake to bite her on the hand. LeAnn reacted by kicking Jake to get him away from her, so Jake attacked a second time, biting her arm. In both biting incidents—the child's and LeAnn's—the bites were sufficiently severe as to warrant hospital visits and stitches.

Brittney sued the Herchmans, asserting claims for strict liability and negligence and seeking to recover for the noneconomic damages that Jake's attack had caused. By the time the case proceeded to a jury trial, more than six years had passed since Jake's attack.

All of the parties testified at trial, as did Jake's veterinarian[2] and his former owner Tammy. Brittney described Jake's attack for the jury, walked through the various medical procedures and complications she had suffered, and explained how her facial wounds and deformity had impacted her life.

The Herchmans, in turn, generally acknowledged that the attack on Brittney had been an unprovoked "horrible accident." But they denied that they had known of Jake's dangerousness prior to Brittney's attack, explaining why they had believed each of Jake's prior biting incidents to have been a justifiable reaction to a specific provocation—the child's climbing on Jake's back or LeAnn's pushing or kicking

---

[2]Although the veterinarian had cared for Jake in the past, he provided limited factual testimony, as he had only a vague memory of his alleged conversations regarding Jake.

Jake—rather than symptoms of his dangerousness. Nonetheless, Paul and Donna acknowledged that, despite the perceived justifications for Jake's prior attacks, such incidents made them "[c]autious" in allowing Jake to interact with guests.

The jury found the Herchmans liable on both of Brittney's claims and awarded her $2 million in damages: (1) $600,000 for physical disfigurement, $500,000 of which was for the past and $100,000 for the future; (2) $1.2 million for physical pain and mental anguish, $800,000 of which was for the past and $400,000 for the future; and (3) $200,000 for physical impairment, split evenly between the past and the future.

The Herchmans appeal.

## II. Evidentiary Sufficiency[3]

The Herchmans first challenge the sufficiency of the evidence to prove (1) the elements of Brittney's strict-liability claim, (2) the elements of her negligence claim, and (3) the damage awards.

### A.    Standard of Review

In reviewing the factual sufficiency of a challenged jury finding—be it a finding on the elements of a claim or a finding quantifying damages—we assess whether the credible evidence supporting the finding is so weak or the finding is so contrary to the

---

[3]The Herchmans' seventy-five-page brief contains screenshots of text-based jury questions and answers, and those screenshots—which are not text-searchable, *see* Tex. R. App. P. 9.4(j)(1)—do not appear to be accounted for in the brief's word-count certification, *see* Tex. R. App. P. 9.4(i)(3). This practice is strongly disfavored, and although we did not return the Herchmans' brief for correction, practitioners would be wise to avoid such practices in the future.

overwhelming weight of the evidence that it must be set aside as manifestly unjust. *Windrum v. Kareh*, 581 S.W.3d 761, 781–82 (Tex. 2019); *City of Keller v. Wilson*, 168 S.W.3d 802, 826 (Tex. 2005); *Golden Eagle Archery*, 116 S.W.3d at 761–62. Although we consider all of the evidence in making this assessment, we remain mindful of the jury's role as the sole arbiter of the witnesses' credibility and the weight to be given each witness's testimony. *Golden Eagle Archery*, 116 S.W.3d at 761–62; *see Wilson v. Murphy*, No. 02-23-00207-CV, 2024 WL 1561468, at *5 (Tex. App.—Fort Worth Apr. 11, 2024, no pet.) (mem. op.) (recognizing that, "[w]hen evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may 'believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness'" (quoting *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018)); *Goff v. Rogers*, No. 02-23-00356-CV, 2024 WL 1318249, at *2 (Tex. App.—Fort Worth Mar. 28, 2024, no pet.) (mem. op.) (same). We cannot substitute the jury's judgment with our own. *Windrum*, 581 S.W.3d at 781; *Golden Eagle Archery*, 116 S.W.3d at 761.

Legal sufficiency, meanwhile, is a lower bar than factual sufficiency; if the evidence is factually sufficient to support a jury finding then it is necessarily legally sufficient to do so. *Walther v. Walther*, No. 02-23-00393-CV, 2024 WL 3978045, at *2 (Tex. App.—Fort Worth Aug. 29, 2024, pet. filed) (mem. op.); *cf. Windrum*, 581 S.W.3d at 781 (noting that a court of appeals generally need not address factual sufficiency if it finds that evidence is legally insufficient). Here, then, we focus on the

Herchmans' factual-sufficiency challenges, which as we shall see, dispose of their relevant legal-sufficiency challenges as well.

## B. Strict-Liability Claim

First, the Herchmans challenge the evidentiary sufficiency of the three elements of Brittney's strict-liability claim: that (1) Jake had dangerous propensities; (2) the Herchmans knew or had reason to know of such propensities; and (3) the dangerous propensities caused Brittney's injuries.[4] *See Marshall*, 511 S.W.2d at 258–59; *Gonzalez v. Ahrens*, No. 14-18-00417-CV, 2019 WL 4071925, at *3 (Tex. App.—Houston [14th Dist.] Aug. 29, 2019, no pet.) (mem. op.); *Rodriguez v. Haddock*, No. 2-01-386-CV, 2003 WL 1784923, at *2 (Tex. App.—Fort Worth Apr. 3, 2003, no pet.) (mem. op.); Restatement (First) of Torts § 509 (Am. L. Inst. 1938).

### 1. Dangerous Propensities

The Herchmans contend that, despite Jake's prior biting incidents, there was insufficient evidence that he had dangerous propensities.

For purposes of a strict-liability dog-bite claim, a dog has "dangerous propensities" if the dog (1) "is vicious, that is, has a tendency to attack human beings or other animals which is abnormal in animals of its class" or (2) "is not vicious but has a dangerous tendency which is unusual and not necessary for the purposes for

---

[4]These elements apply to strict-liability claims asserted against the dog's owner or possessor. *See Marshall v. Ranne*, 511 S.W.2d 255, 258–59 (Tex. 1974); Restatement (First) of Torts § 509 (Am. L. Inst. 1938). The Herchmans do not dispute that they were Jake's owners or possessors.

7

which such animals are usually kept." Restatement (First) of Torts § 509 cmt. c (Am. L. Inst. 1938); *see Marshall*, 511 S.W.2d at 258 (adopting Restatement (First) of Torts §§ 507, 509). The Herchmans—emphasizing their position that, when Jake bit the child and LeAnn, he did so out of fear as "react[ions]" to physical provocations—argue that Jake's actions were not abnormal for a dog.

But the jury was not required to believe the Herchmans' testimony, nor was the jury required to agree with the Herchmans' assessment of Jake's prior attacks as normal dog behavior. *See Golden Eagle Archery*, 116 S.W.3d at 761 (reiterating the "familiar principle" that "the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony"). And there was ample contrary evidence supporting the jury's finding that Jake's biting incidents—both before Brittney and involving Brittney—reflected an abnormal tendency to attack humans:

- Tammy told the jury that, when a boy at her daycare "got[] on top of [Jake's] back," Jake reacted by biting the child's face such that the child had "rips on both sides of [his] mouth" and required stitches. Tammy had been so upset by the attack that it prompted her to get rid of Jake and to close down her daycare "[f]or [her] own well-being." Tammy's response supported an inference that she did not view Jake's reaction to the child as normal dog behavior.

- Jake's veterinarian testified that, hypothetically, if he learned that a dog had attacked a three-year-old and bitten the child's face, he would regard the dog as abnormally dangerous—regardless of what prompted the attack. Then, when provided with the details of Jake's child-biting incident, the veterinarian confirmed that "[a]s a society, we don't call that [i.e., such an attack] normal."

- Tammy further testified that, even before Jake bit the child at her daycare, Jake chased another child's parent to his truck and bit the man's shorts, ripping them and forcing the man to jump into his truck to get away.

8

- Regarding Jake's attack on LeAnn, Donna explained that Jake had jumped up, and when LeAnn pushed him down, he bit her hand so severely as to require stitches. Then, when LeAnn "kicked [Jake] in the chest to get him back" as he was biting her hand, Jake bit her again in the arm—requiring more stitches.

- Donna testified that she did not blame LeAnn for Jake's bite and that, after Jake attacked LeAnn, she knew "there was something abnormal" about Jake and his "triggers." Such acknowledgement was evidence that Donna—a person very familiar with Jake—did not consider Jake's attack on LeAnn to be normal dog behavior.

- It was undisputed that Brittney did nothing to provoke Jake's attack on her and that there was no reasonable explanation for it.

- Despite the undisputed lack of provocation for Brittney's attack, Jake bit her face not just once but "over and over."

- Paul testified that he had owned numerous dogs throughout his life and that none of his other dogs had ever bitten anyone's face or sent anyone to the hospital. He conceded that Jake's behavior in "sen[ding] three people to the hospital" was "[n]ot normal."

While this evidence was met with contradicting testimony regarding Jake's good behavior on other occasions, it was the jury's role—not ours—to "reconcile any inconsistencies" in the evidence, *Stone v. Christiansen*, No. 02-22-00450-CV, 2023 WL 5766076, at *3 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op.), and the evidence supporting the dangerous-propensities finding was not so weak as to render it manifestly unjust. *See Windrum*, 581 S.W.3d at 781–82; *cf. Osburn v. Baker*, No. 04-19-00568-CV, 2020 WL 2441426, at *2 (Tex. App.—San Antonio May 13, 2020, no pet.) (mem. op.) (holding in summary-judgment context that there was more than a scintilla of evidence of dog's dangerous propensities when dog did not take commands, was possessive of his owners, was leery around strangers, and nipped at people's ankles);

9

*Edmonds v. Cailloux*, No. 04-05-00447-CV, 2006 WL 398033, at \*2–3 (Tex. App.—San Antonio Feb. 22, 2006, no pet.) (mem. op.) (holding in summary-judgment context that there was more than a scintilla of evidence of dog's dangerous propensities when dog snapped at a person, knocked a person down, went "into [a] frenzy" upon seeing guests or squirrels, and was described as unpredictable and "crazy").

### 2. Knowledge

The Herchmans next claim that there was insufficient evidence that they knew or had reason to know of Jake's dangerous propensities.[5] *See* Restatement (First) of Torts § 509 cmt. b (Am. L. Inst. 1938) (noting that "reason to know" is defined elsewhere in the Restatement as "mean[ing] that the person in question knows or from facts known to him should know"); *see also Marshall*, 511 S.W.2d at 258–59 (quoting Restatement's definition of "reason to know" and concluding that "[t]here is no essential distinction" between the phrase and "should have known"); Restatement (First) of Torts § 12(1) (Am. L. Inst. 1934) (defining "reason to know"). This is simply not the case.

It was undisputed that all three Herchmans knew about Jake's prior biting incidents:

---

[5]The Herchmans point out that the jury did not make a finding on the knowledge element, but they concede that they did not object to the omission and that, consequently, the omitted element is deemed found by the trial court as long as there is sufficient evidence in the record to support it. *See* Tex. R. Civ. P. 279. They argue that there is insufficient evidence to support the deemed finding.

- Paul and Donna acknowledged that, before they adopted Jake, Tammy told them that Jake had bitten a child in the face.

- Paul and Donna further confirmed that they knew about Jake's attack on LeAnn and that they knew the attack had required LeAnn to visit the emergency room and to get stitches. They explained how they had notified animal control and called Jake's veterinarian after the attack.

- Trace conceded that he had been aware of Jake's attack on LeAnn. And Paul and Donna stated that they had engaged in "multiple discussions" with Trace about Jake's prior biting incidents and about the need to be "cautious" with the dog.

The Herchmans acknowledge much of this evidence but reassert their contention that Jake's prior biting incidents were no indication of his dangerous propensities; thus, they reason, they had no way to know Jake was dangerous. But as we have already held, the factfinder was not required to believe the Herchmans or agree with their belief that Jake's prior biting incidents were normal. *See Golden Eagle Archery*, 116 S.W.3d at 761; *Stone*, 2023 WL 5766076, at *3. Just as the jury could have viewed Jake's prior biting incidents as (in the veterinarian's words) not something that "[a]s a society[] we . . . call . . . normal," it could have found that, because the Herchmans knew of the prior biting incidents, they should have known of Jake's dangerous tendency to attack humans. *See* Restatement (First) of Torts § 509 cmt. b (Am. L. Inst. 1938); *cf. Osborne v. Chocqueel* [1896] 2 QB 109 at 110 (Eng.) (Lord Russell of Killowen CJ) (holding no evidence of scienter in dog-bite appeal when dog had not "on any previous occasion manifested any tendency to bite mankind" and "its record was quite clean except for [an] unhappy incident [with a] goat").

11

Plus, in truth, there was evidence that the Herchmans were either subjectively aware—or at least had been warned—that Jake's prior biting incidents reflected Jake's dangerousness:

- Donna admitted that, after Jake bit LeAnn, she knew "there was something abnormal" about Jake and his "triggers" and that the family needed to be "[c]autious and smart" with the dog.

- Donna testified that she had conversations with Trace "over and over" about Jake's prior biting incidents and about the need to be "cautious and smart" with Jake.

- After Jake bit LeAnn, Paul called Tammy to inform her, and Tammy broke down crying on the phone, telling Paul, "Put the dog down! Put it down! It's already bitten a child; now it's bitten your own daughter! Put the dog down!"

- Paul conceded that, after Jake's attack on LeAnn, the family recognized the need for "special caution" with the dog, they "tr[ied] to keep [Jake] isolated" from guests, and they even considered euthanizing him.

This evidence was plenty strong to support a finding that the Herchmans not only knew of Jake's prior biting incidents—and thus should have known of his dangerous propensities—but also had subjective awareness that the prior biting incidents were abnormal. *See Osburn*, 2020 WL 2441426, at *2 (holding in summary-judgment context that there was more than a scintilla of evidence that owners should have known of dangerous propensities when dog, among other things, was leery around strangers and nipped at people's ankles); *cf. Pfeffer v. Simon*, No. 05-02-01130-CV, 2003 WL 1545084, at *1–2 (Tex. App.—Dallas Mar. 26, 2003, no pet.) (mem. op.) (holding that dog's having eaten pet cockatiel bird under unexplained

circumstances was no evidence that owners knew or should have known of dangerous propensities). The knowledge finding was not manifestly unjust.

### 3.     Causation

In their final challenge to Brittney's strict-liability claim, the Herchmans argue that there was insufficient evidence to show that Jake's dangerous propensities were what caused him to attack Brittney. They claim that, even if Jake had dangerous propensities generally, his attack on Brittney was not a manifestation of those propensities but instead was Jake's "react[ing] as a normal dog would have reacted" when Brittney "startled" him. This argument has zero support in the record—much less enough support to show that the jury was manifestly unjust in finding to the contrary.

Not one witness testified that Jake's attack on Brittney was how "a normal dog would have reacted," as the Herchmans now argue. Trace was the only witness who referenced the possibility that "maybe" Jake attacked Brittney because he had been startled by her moving to pick up her drink, but Trace did not claim that biting Brittney's face over and over was how a normal dog would have reacted to being startled.[6] And Trace was crystal clear that Brittney had done nothing wrong.

In fact, from the very beginning of the case, the Herchmans all but conceded that Jake's reaction to Brittney had been abnormal. In their opening statement, the

---

[6]When Trace was asked if he believed "any dog would do something like this to somebody," he responded by repeatedly stating that he thought the attack was "a horrible accident."

13

Herchmans' trial counsel told the jury that "[w]e don't know what was going on in [Jake's] mind" that caused him to attack Brittney and that the absence of a reasonable explanation for the attack was what had caused the Herchmans to euthanize Jake so quickly afterward. The jury's finding that Jake's dangerous propensities caused his attack on Brittney was thus consistent with the evidence and was not manifestly unjust. *Cf. Edmonds*, 2006 WL 398033, at *3 (holding in summary-judgment appeal that there was more than a scintilla of evidence that dog's dangerous propensities caused injuries when plaintiff's testimony and records indicated that she fell because dog "knocked [her] legs out from under [her]").

Having rejected the Herchmans' three challenges to the elements of Brittney's strict-liability claim, we overrule their overarching factual-sufficiency challenge to that claim, and with it, their legal-sufficiency challenge to that claim. *See Walther*, 2024 WL 3978045, at *2 ("If the evidence is factually sufficient, then it is necessarily legally sufficient.").

## C.     Negligence Claim

The Herchmans next challenge the legal and factual sufficiency of the evidence to support the elements of Brittney's negligence claim. But because we have already held that the evidence is sufficient to support Brittney's strict-liability claim, and because the strict-liability claim can support the judgment standing alone, we need not address the negligence claim. *See DLA Piper LLP (US) v. Linegar*, 539 S.W.3d 512, 520 (Tex. App.—Eastland 2017, pet. denied); *Natho v. Shelton*, No. 03-11-00661-CV, 2014

14

WL 2522051, at *1 (Tex. App.—Austin May 30, 2014, no pet.) (mem. op.); *Calvin v. Neel*, 191 S.W. 791, 794 (Tex. App.—Fort Worth 1916, writ ref'd) ("The fact that several reasons are given by the court for the verdict rendered, and that some of such reasons are not supported by the record, will not render such judgment bad, if it can be sustained by other reasons given."); *see also* Tex. R. App. P. 47.1. We overrule the Herchmans' challenges to the negligence claim.

## D. Damage Awards

This brings us to damages. The jury awarded $2 million for Brittney's noneconomic injuries: (1) physical disfigurement damages of $500,000 for the past and $100,000 for the future; (2) physical pain and mental anguish damages of $800,000 for the past and $400,000 for the future; and (3) physical impairment damages of $100,000 for the past and $100,000 for the future. The Herchmans challenge the factual sufficiency of the evidence to support the amounts of each of these awards.[7] But such challenges—much like the sufficiency complaints we have already addressed—ultimately turn on the jury's credibility determinations. *See Golden*

---

[7]The Herchmans lodge a general complaint regarding Brittney's failure to present evidence of her economic damages, arguing that this choice "deprived the jury . . . of any opportunity to evaluate the subjective elements of damages by reference to the economic damages." "But the possibility that economic and noneconomic damages may correlate or inform one another in certain situations does not mean that they are necessarily connected in all cases or that the ratio between the two is always a useful tool," and the Herchmans have not explained why economic damages were an appropriate yardstick for measuring Brittney's noneconomic damages in this case. *Gregory v. Chohan*, 670 S.W.3d 546, 560 (Tex. 2023) (plurality op.).

15

*Eagle Archery*, 116 S.W.3d at 761 (reiterating that "a[n appellate] court must not merely substitute its judgment for that of the jury").

### 1. Applicable Law

A jury "has great discretion" in awarding damages, and "[t]he more subjective the damages alleged, the more deference we give to jury findings on those damages." *Stone*, 2023 WL 5766076, at \*2–3 (reviewing jury's findings on noneconomic damages in dog-bite case). "Assigning a dollar value to non-financial, emotional injuries such as mental anguish . . . will never be a matter of mathematical precision," and we review an award for noneconomic damages with this firmly in mind. *Gregory*, 670 S.W.3d at 550 (plurality op.); *Boxer Prop. Mgmt. Corp. v. Dehnel*, No. 02-22-00336-CV, 2024 WL 3282541, at \*28 (Tex. App.—Fort Worth July 3, 2024, pet. filed) (mem. op.).

Yet, the jury's discretion is not boundless. Although the amount of a noneconomic damages award is "uniquely within the factfinder's discretion," the award must still "fairly and reasonably compensate" for the plaintiff's injury based on the evidence presented. *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017); *Golden Eagle Archery*, 116 S.W.3d at 772–73; *see Stone*, 2023 WL 5766076, at \*2. If the jury's award "is so against the great weight and preponderance of the evidence as to be manifestly unjust," then it must be reversed.[8] *Golden Eagle Archery*, 116 S.W.3d at 772–73.

---

[8]A plurality of the Texas Supreme Court has proposed a new standard for reviewing the size of noneconomic damage awards, requiring a "rational connection, grounded in the evidence, between the injuries suffered and the dollar amount awarded." *Id.* at 550–51, 560–64 (plurality op.) (criticizing "shocks the conscience"

## 2. **Physical Disfigurement**

The Herchmans first challenge the jury's awards of $500,000 for Brittney's past disfigurement and $100,000 for her future disfigurement. In the damages context, "disfigurement" refers to "that which impairs or injures the beauty, symmetry, or appearance of a person . . . ; that which renders unsightly, misshapen[,] or imperfect, or deforms in some manner.'" *Werner Co. v. DeVallee*, No. 02-19-00043-CV, 2021 WL 1134387, at *11 (Tex. App.—Fort Worth Mar. 25, 2021, pet. denied) (mem. op.). Here, the Herchmans argue that the jury's awards were excessive, downplaying the severity of Brittney's scarring and claiming that her scars were "unnoticeable just four months after the incident."

---

test as "subjective," and referencing constitutional law's rational-basis standard). The plurality contemplated that the required rational connection could be provided by, among other things, an argument of counsel. *Id.* at 561–62 (plurality op.) (stating that "[a]n attorney . . . should be expected to articulate the *reason why* the amount sought is reasonable and just"). Here, Brittney's counsel compared Brittney's injuries to "a job that she didn't want . . . [—]to live with a disfigurement on her face for the rest of her life"—and thus proposed valuing her damages based on an hourly rate. Giving the minimum wage as an example, Brittney's counsel reasoned that, if Brittney were to be compensated for her hourly emotional struggles for the next forty years of her life, her future damages would total $2.14 million. Although, at first glance, the verdict's $2 million total appears to bear some resemblance to Brittney's hourly-rate calculation, further examination reveals that the jury did not fully adopt Brittney's method, as the future damages awarded totaled just $600,000—a far cry from the $2.14 million requested.

Regardless, the Herchmans do not argue that Brittney's hourly-rate proposal constituted "unsubstantiated anchoring" or injected an "improper yardstick" into deliberations. *Id.* at 557–58 (plurality op.); *id.* at 576 (Bland, J., concurring); *cf. Turner v. Duggin*, 532 S.W.3d 473, 485–86 (Tex. App.—Texarkana 2017, no pet.) (affirming evidentiary sufficiency of noneconomic damages in dog-bite case when plaintiff proposed per-hour calculation).

But the Herchmans fail to acknowledge the significant amount of evidence to the contrary—evidence that the jury was entitled to believe. *See Golden Eagle Archery*, 116 S.W.3d at 761 (reiterating that "the jury is the sole judge of the credibility of witnesses"); *Stone*, 2023 WL 5766076, at *3 (noting in dog-bite case that "the jury may 'believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness'" (quoting *Anderson*, 550 S.W.3d at 616)). Such evidence showed that Jake's bites left Brittney with a severe deformity on a prominent part of her body—her face:

- Photographs of Brittney without makeup showed that she had multiple scars covering the majority of her left cheek, spanning from just below her eye to her chin and extending from the side of her mouth to the back of her jaw.

- Brittney testified that she had to have her wound closed by a plastic surgeon and that closing it required more than 140 stitches in three layers.

- The jury saw photographs of Brittney's face right after the attack—with visible bite marks all over one cheek—and photographs of her face in various stages of bandaging and healing. Needless to say, the wounds were noticeable in the photographs.

- Brittney described how the wounds on her face had healed such that she had a walnut-sized "wad of extra flesh . . . inside [her] mouth."

- Brittney testified that, because a portion of her facial "muscle tissue [wa]s not working correctly" after Jake's attack, her "smile slant[ed] downward."

- Photographs admitted into evidence captured and confirmed the asymmetry of Brittney's smile.

- Perhaps most importantly, the jury saw Brittney testify in person without makeup, so it was able to gauge the severity of her facial deformity based on its firsthand observation.

18

Brittney had been just 28 years old at the time of Jake's attack, and there was evidence that her facial deformity was effectively permanent. *Cf. SunBridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 252–53 (Tex. App.—Texarkana 2005, no pet.) (suggesting remittitur of past-disfigurement damages to $100,000 when "the duration of the disfigurement . . . was only four days" before death but photographs showed "significant swelling, distortion, and discoloration of [the decedent's] face and hands" after falling). She told the jury that, although her surgeons had discussed the possibility of a corrective surgery, they estimated "a fifty-fifty shot of it healing better or it could heal worse," so Brittney was not planning to pursue the surgery.

The jury's $500,000 and $100,000 disfigurement awards were not significantly larger than those approved in other cases involving prominent deformities. *See Werner*, 2021 WL 1134387, at *8 ("Even though each case must be judged on its own unique facts, it is proper to consider other approved awards in similar cases to determine if an award for pain and suffering is excessive."); *cf. Diamond Offshore Servs. Ltd. v. Williams*, 510 S.W.3d 57, 76–77 (Tex. App.—Houston [1st Dist.] 2015) (affirming $575,000 for disfigurement when injured employee bore scars on back from surgeries and suffered nerve damage that caused him to walk with a limp), *rev'd on other grounds*, 542 S.W.3d 539 (Tex. 2018); *Rentech Steel, L.L.C. v. Teel*, 299 S.W.3d 155, 165 (Tex. App.—Eastland 2009, pet. dism'd) (affirming $1.5 million for past disfigurement and $50,000 for future disfigurement—in addition to awards for pain, suffering, and impairment—when plaintiff suffered bilateral hand injuries and jury saw photographs of hands and

of other skin-graft scars). And given the "inherent indeterminacy" of disfigurement awards and the evidence presented—evidence that Brittney's deformity was on her face; that it had been conspicuous while the wounds were healing; that it remained noticeable after it had scarred; that it rendered her smile asymmetrical; that it altered the inside of her mouth; and that it was permanent—we cannot say that the $500,000 and $100,000 awards were manifestly unjust or that they did not "fairly and reasonably compensate" Brittney. *See Gregory*, 670 S.W.3d at 555 (plurality op.); *Bennett*, 525 S.W.3d at 648. The Herchmans' challenges to these awards fail.

### 3. Physical Pain and Mental Anguish

Next, the Herchmans challenge the jury's awards of $800,000 for Brittney's past physical pain and mental anguish and $400,000 for her future physical pain and mental anguish.

"The presence or absence of pain, either physical or mental, is an inherently subjective question," and thus "largely depend[s] on the plaintiff's word" and on the jury's credibility determinations. *Wilson*, 2024 WL 1561468, at *6; *Turner*, 532 S.W.3d at 484 (quoting *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551 (Tex. App.—Fort Worth 2006, pet. denied) (op. on reh'g)). In addition to a plaintiff's testimony, evidence of a severe injury will support an inference that the plaintiff experienced pain and suffering. *Gen. Motors Corp.*, 203 S.W.3d at 552. To establish mental anguish, meanwhile, a plaintiff must show—through her testimony or otherwise—the "nature, duration, and severity" of her anguish, demonstrating that it has "caused a substantial

20

disruption in [her] daily routine or a high degree of mental pain and distress." *Gregory*, 670 S.W.3d at 555 (plurality op.); *Boxer Prop. Mgmt.*, 2024 WL 3282541, at *29; *Wilson*, 2024 WL 1561468, at *7.

Here, the Herchmans claim that the $800,000 and $400,000 awards overcompensate Brittney. According to them, Brittney's "testimony regarding actual physical pain was that it lasted less than a month,"[9] and "the crux of [her mental-anguish] evidence . . . [was] that her son occasionally asks her about the scar." But this is an exaggeration of the record, and it overlooks Brittney's testimony to the contrary—testimony that, again, the jury was entitled to believe. *See Wilson*, 2024 WL 1561468, at *6–7 (stating that physical pain and mental anguish damages "turn[] on the plaintiff's credibility—the evaluation of which lies solely with the jury").

Brittney testified to the physical pain that she had suffered as a result of Jake's attack:

- At the time of Jake's attack, the bites bled so much that, when Brittney saw the amount of blood she was losing, she fainted.

- Jake's bites were sufficiently severe as to cause nerve damage to Brittney's face. Brittney's medical records reflect that one of the wounds "almost completely penetrate[d] through [her] cheek." [Capitalization altered.]

- When Brittney was discharged from the hospital after the attack, she was prescribed hydrocodone.

- Brittney was awake for the 149 stitches to her face, which were done in "three different layers." She recalled being "extremely nauseous" during the procedure

---

[9]The Herchmans have not cited anywhere in the record where Brittney testified that her "physical pain . . . lasted less than a month."

such that the surgeon "kept having to take breaks because [Brittney] was almost going to throw up."

- Brittney's stitches were in place for three weeks, but it was not a seamless healing process; she developed an infection "a couple of days after the stitches" and required antibiotics.

- Brittney described how, in the weeks after the attack, it "hurt to open [her] mouth."

- Brittney stated that scar tissue from the stitches left "a wad of extra flesh . . . inside [her] mouth" the size of "a walnut." Although six years had passed by the time of trial, Brittney testified that she continued to accidentally bite the "wad" of tissue, causing it to bleed and leaving her with ulcers in her mouth.

Brittney also described the mental toll that Jake's attack had taken and

continued to take on her:

- She stated that she had "really loved dogs" before the attack but that, after the incident, she "became so afraid of dogs."

- She recalled how, a few years after the attack, a random dog had jumped out of the back of a truck at a gas station and had been "snarling and trying to attack [her]," and she had "got[ten] on the ground, curled up in a ball[,] and was screaming and crying."

- Brittney opened up about how "ugly" and self-conscious her scarring made her feel. She stated that, after the attack, she began changing her positioning or clothing to cover the scarring, often donning a hat, wearing her hair down, turning her face, or standing to one side in photographs.

- She testified that she continued to worry that people would think her "scar face" looked like "Frankenstein" because, in her words, "it doesn't look normal."

- Brittney testified that, because her "smile slants downward," she "do[es]n't smile" and "tr[ies] not to smile with [her] teeth in pictures."

- Brittney explained that she had taken numerous makeup classes to "try to cover [the scarring] as much as [she] c[ould]," and that—even six years after Jake's

attack—she "still think[s] about it every day, especially when [she is] putting on [her] makeup and thinking about how much makeup [she] ha[s] to put on to cover it up or make it look less puckered and red."

- Brittney described how she has "bigger holes [on her face] where the threading came out" from her stitches, how the holes frequently fill "full of bacteria and makeup and debris," and how the bacteria causes her scarring to become "angry" and "get blackheads." She stated that, because "[s]car tissue doesn't heal the same as other skin," it can take up to two weeks for her scarring to heal from a breakout.

- Brittney explained that, because she was self-conscious about her scarring and wanted to look her best on social media, she felt the need to airbrush her photographs before posting them online. She estimated that she spent about "25, 30 minutes" per photograph airbrushing out her scarring.

Additionally, as already noted, Brittney confirmed that her scars—and the wad of flesh, the ulcers, and the mental anguish accompanying them—were permanent. Brittney's counsel encouraged the jury to consider this in awarding damages for physical pain and mental anguish, emphasizing that Brittney would be "looking in the mirror every single day" knowing she would never look the same.

The $800,000 and $400,000 awards were not outlandish in comparison to other approved pain-and-anguish awards for similarly prominent, permanent injuries. *See Turner*, 532 S.W.3d at 484–86 (affirming jury's award of $350,000 for future physical pain and mental anguish when dog bit plaintiff's leg, damaging veins and resulting in persistent leg swelling and pain); *Diamond Offshore Servs.*, 510 S.W.3d at 79–80 (affirming $3.4 million for future pain and mental anguish when mechanic's back injury caused pain, limp, and depression); *Rentech Steel*, 299 S.W.3d at 165–66 (affirming $1.75 million for past mental anguish and $300,000 for future—in addition

23

to damages for pain—when plaintiff suffered bilateral hand injuries and experienced depression and painkiller addiction); *see also Gibbins v. Berlin*, 162 S.W.3d 335, 344–45 (Tex. App.—Fort Worth 2005, no pet.) (affirming $100,000 award for future pain and mental anguish when assault left plaintiff with "a 'sloppy' smile"). While the awards were certainly significant, they reflected the combined sums for two types of damages—physical pain and mental anguish—both of which were "almost entirely subjective," making the jury's role in assessing such damages "paramount." *Wilson*, 2024 WL 1561468, at *7 (reviewing zero-damages award for pain and mental anguish). And based on the extensive evidence of Brittney's nauseating physical pain after the attack; the complications from her wound healing; the ongoing ulcers she suffered; her newfound fear of dogs; her reluctance to smile; and the self-consciousness she experienced on a daily basis as a young woman inflicted with a noticeable, permanent facial deformity, the awards were within the range of the jury's broad discretion. *See Stone*, 2023 WL 5766076, at *3 ("[T]he more subjective the damages alleged, the more deference we give to jury findings on those damages."). The Herchmans' challenges to these awards fail.

### 4. Physical Impairment

The Herchmans' final sufficiency challenge takes issue with the jury's award of $100,000 for Brittney's past physical impairment and $100,000 for her future physical impairment.

Physical-impairment damages compensate a plaintiff for "the loss of the injured party's former lifestyle" to the extent that such injuries "are distinct from, or extend beyond, injuries compensable through other damage elements" and "had a 'substantial' effect" on the plaintiff. *Id.* at *4. The Herchmans claim that Brittney did not suffer any impairment distinct from her mental anguish and physical disfigurement. According to them, "[t]he only evidence of physical impairment was that [Brittney] occasionally bites the inside of her cheek and [wa]s self-conscious of her smile—but this [wa]s not separate from her mental anguish damages claim [so it was] not evidence of an actual physical impairment."

But once again, the Herchmans overlook contrary evidence that the jury was entitled to credit:

- Brittney testified that, for several weeks after the attack, she "couldn't really wash [her] face that well," and she could not eat solid food.

- At the time of trial six years after the attack, Brittney continued to experience "numbness" such that she "c[ould not] feel the skin" on part of her face.

- Brittney testified that her scarring causes her to drool if she sleeps on her right side and that the drooling leaves her lips chapped and prone to cuts.

- Brittney stated that, because of the walnut-sized "wad of extra flesh . . . inside [her] mouth," she has had to change the way she eats to avoid biting the extra tissue, chewing slowly and carefully on the relevant side of her mouth.

Brittney's counsel discussed these impairments in closing argument, reminding the jury of "all the things that [Brittney] can't do now that [she] used to be able to," including Brittney's "very careful chewing" and how "her sleep has changed."

25

Contrary to the Herchmans' contentions, these impairments were distinct from the physical disfigurement, physical pain, and mental anguish that Brittney had suffered. Yet, the Herchmans do not identify any other reason why they believe the physical-impairment damages require reversal.

Indeed, the $100,000 awards for past and future impairment were not excessive in light of other approved impairment awards. *See Diamond Offshore Servs.*, 510 S.W.3d at 80 (affirming $1.7 million for future physical impairment—in addition to damages for disfigurement, pain, and mental anguish—when rig worker described hobbies he could no longer engage in after back injury); *Rentech Steel*, 299 S.W.3d at 165–66 (affirming $2 million for past impairment and $1 million for future—in addition to awards for pain, suffering, and disfigurement—when plaintiff suffered bilateral hand injuries that limited his ability to write and rendered him "unable to do many everyday tasks like open a water bottle"); *SunBridge Healthcare*, 160 S.W.3d at 253 (suggesting remittitur of past-impairment damages to approximately $100,000 when impairment lasted just four days before death but decedent was "deprived of her ability to communicate or function in any meaningful manner" for those four days). And given the credible evidence of Brittney's physical impairment, we cannot say that these awards were manifestly unjust or unreasonably compensated her for the permanent changes to her lifestyle. *Cf. Stone*, 2023 WL 5766076, at *5 (affirming lack of impairment damages in dog-bite case in part because evidence "was predominantly made up of [the appellant's] own testimony—which the jury, as the sole judge of a

witness's credibility, was free to disbelieve" so jury's finding was not "clearly wrong [or] unjust"). The impairment awards were within the jury's discretion.

Having rejected the Herchmans' challenges to each of the damage awards, we overrule their broader factual-sufficiency issue.

### III. Evidentiary Rulings

The Herchmans next challenge the trial court's rulings on the admissibility of evidence. Specifically, they take issue with (1) the exclusion of Brittney's medical expenses; (2) the admission of testimony referencing liability insurance; and (3) the admission of testimony from Paul regarding his "personal wealth." None of these complaints were preserved.[10]

### A.      Standard of Review

To preserve a complaint regarding the admission or exclusion of evidence, a party must present the trial court with a timely request, objection, or motion that states the specific grounds for the desired ruling (if not apparent from the context), and the party must obtain a ruling. *See* Tex. R. App. P. 33.1(a); *Bushell v. Dean*, 803 S.W.2d 711, 711–12 (Tex. 1991) (op. on reh'g) (holding that, because appellant failed

---

[10]To the extent that the Herchmans intend to rely on their motion in limine for preservation purposes, they cannot do so. *See In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (orig. proceeding) (explaining that "a protective limine order alone does not preserve error" and that when "the party that requested the limine order *itself* introduces the evidence into the record, and then fails to immediately object, . . . the party waives any subsequent alleged error on the point"); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 637 (Tex. 1986) (op. on reh'g) (holding that "to preserve error as to an improper question asked in contravention of a sustained motion in limine, a timely objection is necessary").

to object to admission of testimony, her complaints regarding the testimony "were not before the appellate court for review").

## B. Medical Expenses

The Herchmans complain that the trial court excluded their evidence of Brittney's medical expenses, insisting that Brittney's medical bills were relevant. But neither party has cited—nor has this court found—anywhere in the record where the bills were offered and the trial court excluded them as irrelevant.[11] Because the Herchmans failed to offer or obtain a ruling on the evidence they claim should have been admitted, they have not preserved this issue for review. *See* Tex. R. App. P. 33.1(a)(1) (requiring "a timely request . . . or motion" as "a prerequisite to presenting a complaint for appellate review"); *Tex. Dep't of Transp. v. Olson*, 980 S.W.2d 890, 896–97 (Tex. App.—Fort Worth 1998, no pet.) (holding challenge to evidence's exclusion not preserved because appellant did not offer the evidence at trial).

## C. Liability Insurance

The Herchmans also complain of Brittney's reference to insurance during her testimony.[12] But the challenged testimony was elicited by the Herchmans' own counsel, and the Herchmans did not object to it. This challenge, like the last one, is

---

[11]The Herchmans point us to their pretrial exhibit lists, which mention Brittney's medical billing records. But the exhibit lists do not reflect a trial court ruling on the admission or exclusion of the bills.

[12]Specifically, Brittney explained that, although she had since been bitten by a second dog after Jake's attack, she had not sued the second dog's owner because that owner "did not have insurance."

not preserved for our review. *See* Tex. R. App. P. 33.1(a)(1) (requiring "a timely . . . objection" as "a prerequisite to presenting a complaint for appellate review"); *Lee v. Boynton*, No. 09-98-295 CV, 1999 WL 342780, at *3 (Tex. App.—Beaumont May 27, 1999, no pet.) (per curiam) (not designated for publication) (holding appellant failed to preserve challenge to insurance-related testimony because appellant did not object).

## D.     Wealth

In their final evidentiary complaint, the Herchmans challenge the admission of testimony regarding Paul's sale of his company, which they characterize as evidence of Paul's wealth. But once again, the Herchmans did not object to the challenged testimony, so the issue is not preserved for our review.[13] *See* Tex. R. App. P. 33.1.(a)(1); *Morrison v. Quarrington*, No. 12-22-00302-CV, 2024 WL 2858838, at *21 (Tex. App.—Tyler May 15, 2024, pets. denied) (mem. op. on reh'g) (holding appellant failed to preserve challenge to wealth-related testimony because she failed to object).

Because none of the Herchmans' three challenges to the trial court's evidentiary rulings were preserved, we overrule this issue.

---

[13]In their reply brief, the Herchmans claim that they "brought the[] errors to the attention of the trial court" in an off-the-record "sidebar." But the off-the-record discussion was, as the name implies, off the record. If the Herchmans lodged an objection off the record, that objection was not recorded and did not preserve the objected-to issue for appellate review. *See Warrantech Corp. v. Comput. Adapters Servs., Inc.*, 134 S.W.3d 516, 529 (Tex. App.—Fort Worth 2004, no pet.) (holding challenge to admission of testimony not preserved when appellant made a general objection "followed by an off-the-record bench conference, [which] did not create a record sufficient to preserve the complaint for our review").

## IV. Jury Charge

The Herchmans next complain of the trial court's failure to submit a proportionate-responsibility question in the jury charge and of the corresponding imposition of joint-and-several liability without a supportive jury finding. Once again, though, the Herchmans have failed to preserve this issue.[14]

To preserve error on a jury-charge issue, the party must object to the charge. *See* Tex. R. App. P. 33.1(a)(1); Tex. R. Civ. P. 274, 278; *King Fisher Marine Serv., L.P. v. Tamez*, 443 S.W.3d 838, 843–45 (Tex. 2014). The Herchmans did not object to the lack of a proportionate-responsibility question in the jury charge, so their challenge to the question's omission is not preserved.[15] *See Anderson v. Hiley Cars Hurst, LP*, No. 02-

---

[14]Moreover, even if the Herchmans had preserved the issue in the trial court, the adequacy of their briefing is questionable. The Herchmans' argument on proportionate responsibility is entirely devoid of any record citations. *See* Tex. R. App. P. 38.1(i) (requiring an appellant's argument to include "appropriate citations . . . to the record"). "[W]e are not responsible for searching the record for facts that are favorable to the appellant[s'] position," and "[i]n the absence of appropriate record citations . . . , a brief does not present an adequate appellate issue." *NexPoint Advisors, L.P. v. United Dev. Funding IV*, 674 S.W.3d 437, 446–47 (Tex. App.—Fort Worth 2023, pets. denied) (holding issue inadequately briefed).

[15]Within their jury-charge issue, the Herchmans contend that, absent a jury finding on proportionate responsibility, there was no legal basis for the trial court to hold them jointly and severally liable for the judgment. To the extent that the Herchmans intend to raise this as a separate appellate issue, and putting aside their briefing deficiencies, *see supra* note 14, the imposition of joint and several liability was not erroneous. Texas has long recognized that, "[w]here the tortious acts of two or more wrongdoers join to produce an indivisible injury, . . . all of the wrongdoers will be held jointly and severally liable for the entire damages." *Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952); *see Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984) (noting that plaintiff seeking to recover for defendants'

23-00091-CV, 2024 WL 3195094, at *3 (Tex. App.—Fort Worth June 27, 2024, no pet.) (mem. op.) (holding appellant failed to preserve challenge to charge's conditioning of proportionate-responsibility question on separate question); *EYM Diner L.P. v. Yousef*, No. 05-19-00636-CV, 2020 WL 6883171, at *11 (Tex. App.—Dallas Nov. 24, 2020, pet. dism'd) (mem. op.) (holding appellants did not preserve objection to party's exclusion from proportionate-responsibility charge instruction); *Sears, Roebuck & Co. v. Abell*, 157 S.W.3d 886, 891–93 (Tex. App.—El Paso 2005, pets. denied) (holding defendant waived complaint regarding lack of proportionate-responsibility question by failing to submit question or object to its absence in the charge).

We overrule the Herchmans' challenge to the jury charge.

## V. Interest of Justice

In their final appellate issue, the Herchmans assert that the interest of justice requires a new trial given the totality of the errors complained of—the allegedly "excessive, and perhaps punitive, damages in this case"; the allegedly erroneous evidentiary rulings; and the lack of a proportionate-responsibility question in the jury

---

negligence and strict liability had suffered "indivisible injury as a result of the tortious acts of two wrongdoers, [so] she had the option of proceeding to judgment against any one defendant separately or against all in one suit"). Here, the Herchmans were held strictly liable for a single, indivisible injury: Brittney's noneconomic damages from Jake's attack. Although the Herchmans claim that the jury could have apportioned responsibility based on their varying degrees of negligence, they do not address the jury's strict-liability findings, which were independently sufficient to support the judgment. *See supra* Sections II.B–C.

charge. But as we have already held, the evidence was sufficient to support the damages awarded, and the evidentiary-ruling and jury-charge issues were not preserved. *See supra* Sections II.D–IV. Unpreserved issues and non-errors do not transform into a preserved, reversible error when combined. *See Arreola v. Union Pac. R.R.*, 657 S.W.3d 789, 825 (Tex. App.—El Paso 2022, no pet.) (holding no cumulative error when court had overruled all of appellant's challenges to individual errors); *Univ. of Tex. at Austin v. Hinton*, 822 S.W.2d 197, 205 (Tex. App.—Austin 1991, no writ) (similar); *Boggus v. Miller*, 388 S.W.2d 240, 243 (Tex. App.—Fort Worth 1965, writ ref'd n.r.e.) ("In view of our conclusions to the contrary of [the appellant's] contention that there was any individual error, we also overrule [his] final point which asserts that the 'accumulation of error' was such as deprived him of a fair trial.").

We overrule the Herchmans' final issue.

## VI. Conclusion

Having overruled all of the Herchmans' appellate issues, we affirm the judgment. *See* Tex. R. App. P. 43.2(a).

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: November 27, 2024